# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

|  |  |  |
|---|---|---|
| LUMUMBA K. INCUMAA, #155651 | ) | |
| *also known as* THEODORE | ) | |
| HARRISON, JR. | ) | |
| | ) | No. 9:12-cv-3493-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| BRYAN P. STIRLING, | ) | |
| *Acting Director of the South Carolina* | ) | |
| *Department of Corrections*,[1] | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Magistrate Judge Bristow Marchant's Report and Recommendation ("R&R") that this court grant defendant Bryan Stirling's motion for summary judgment. Plaintiff Lumumba Incumaa ("Incumaa") filed written objections to the R&R. For the reasons set forth below, the court adopts the R&R and grants summary judgment in favor of defendant.

## I.  BACKGROUND

Incumaa is an inmate within the South Carolina Department of Corrections ("SCDC") who is currently incarcerated at the Lieber Correctional Institute. He is a member of the Nation of Gods and Earths, a group commonly referred to as the Five Percenters. Pl.'s Br. in Supp. of Compl. 1. While Incumaa asserts that the Nation of Gods and Earths is a religion, Id., SCDC considers the Five Percenters a gang that promotes a racist ideology. Def.'s Mot. for Summ. J. 8.

---

[1] Bryan P. Stirling became the Acting Director of the South Carolina Department of Corrections on October 1, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Bryan P. Stirling should be substituted for the Honorable William R. Byars, Jr. as the defendant in this lawsuit.

In 1995, following three violent incidents involving Five Percenters, SCDC promulgated a policy designating the Five Percenters a security threat group ("STG"). In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 465 (4th Cir. 1999). In the most serious of these incidents,

> six Five Percenters and one other inmate staged a riot in the Broad River Correctional Institution. Wielding knives, softball bats, and a variety of improvised weapons, the inmates attacked and severely injured several correctional officers in the prison cafeteria and yard. The inmates then seized one officer and two food service employees as hostages, leading to an eleven-hour standoff with law enforcement personnel. Four officers were hospitalized as a result of these events.

Id. In an affidavit, Elbert Pearson, an investigator with the SCDC Special Investigations Unit ("SIU"), asserts that since 1995, Five Percenters have been involved in acts of violence and other disruptive conduct within SCDC, including "assaultive behavior against staff, threats to inflict harm on staff, possession of weapons, and inciting or creating a disturbance." Pearson 2d Aff. ¶ 2. Pearson includes a chart showing that then number of incidents involving Five Percenters appears to be trending downward and opines that the decline is a result of the STG policy. Id. ¶ 3.

According to Pearson, STGs are groups that have been designated by the SCDC director to be a threat to the security of correctional institutions within the SCDC system. Pearson Aff. ¶ 2. Once an individual has been deemed a suspected member of an STG, the SIU rigorously investigates the individual to see if he can be validated as an STG member. Id. ¶ 9. In order to be validated, the individual must exhibit at least two validating factors, and the investigator, the investigator's supervisor, and the SIU branch chief must all sign off on the validation of the individual. Id. ¶ 10. Once an individual has been validated as an STG member, that individual will receive one of two

classifications:  Validated-GP (general population) or Validated-SD (security detention).
Id. ¶ 11.  A validated STG member who has not committed or been implicated in any
disciplinary infractions or STG activities is typically, although not always, classified
Validated-GP and allowed to remain in the general population.  Id. ¶ 12.  On the other
hand, an STG member who has committed disciplinary infractions or participated in STG
activities is typically classified Validated-SD and would be placed in a special
management unit ("SMU").  Id. ¶ 13.

Once a validated STG member has been classified as Validated-SD, the individual
remains in the SMU until the individual is released following a review of his
classification status, the individual renounces his affiliation as an STG member, or the
group to which the individual belongs is removed from the STG list by the SCDC
director.  Id. ¶ 14.  In order to renounce one's membership in an STG, a renunciation
committee is formed to evaluate the individual's sincerity and the warden and SIU must
sign off on the committee's recommendation in order for the individual to be released.
Id. ¶¶ 15-18.

Because the Five Percenters have been designated as an STG, the group's
literature, writings, and other information have been declared contraband within SCDC.
Id. ¶ 23.  While a validated Five Percenter remains in the general population, he is not
allowed to possess any written literature or materials of the group, engage in STG
activities, or attempt to recruit other members to the group.  Id. ¶ 25.  However, for STG
members confined in the SMU, there is a process by which STG materials can be
returned to those inmates.  Id. ¶ 26-20.

According to Pearson, Incumaa, then known as Theodore Harrison, was one of the Five Percenters implicated in the Broad River riot.  Pearson Aff. ¶ 21.  Incumaa has been in administrative segregation since early 1996, or about 18 years.  Id.  Incumaa was originally housed in the maximum security unit but is currently in the SMU.  Pl.'s Objections 10.  According to SCDC Branch Chief of Records Management Michael J. Stobbe, Incumaa has had his custody status reviewed by the Classification Committee Review Board every thirty days.  Stobbe Aff. ¶ 3.  However, Incumaa claims to have never been before the Classification Committee Review Board and that he simply receives a form, SCDC Form 19-30, in the mail each month.  Pl.'s Objections 12.

Incumaa filed the present action on December 12, 2012 pursuant to 42 U.S.C. §1983, claiming that SCDC is substantially burdening the exercise of his religious rights in violation the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and that he has not been afforded adequate due process in violation of the Fourteenth Amendment.   On May 20, 2013, Incumaa filed a brief in support of his complaint accompanied by several exhibits.  On July 16, 2013, defendant filed a motion for summary judgment.  The magistrate judge issued an R&R on September 24, 2013. Incumaa filed objections to the R&R on October 2, 2013.  On January 28, 2014, this court requested additional briefing from defendant regarding whether the government had acknowledged and given consideration to less restrictive means.  Defendant submitted a supplemental brief and additional affidavit on February 27, 2014 and Incumaa responded on March 10, 2014.  The matter is now ripe for the court's review.

## II.  STANDARD OF REVIEW

### A.    Objections to R&R

This court is charged with conducting a <u>de novo</u> review of any portion of the magistrate judge's R&R to which specific, written objections are made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 149-50 (1985).  In absence of a timely filed objection to a magistrate judge's R&R, this court need not conduct a <u>de novo</u> review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's note).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court.  <u>Mathews v. Weber</u>, 423 U.S. 261, 270-71 (1976).  This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration.  28 U.S.C. § 636(b)(1).

### B.    <u>Pro Se</u> Plaintiffs

Plaintiff is proceeding <u>pro se</u> in this case.  Federal district courts are charged with liberally construing complaints filed by <u>pro se</u> litigants to allow the development of a potentially meritorious case.  <u>See</u> <u>Hughes v. Rowe</u>, 449 U.S. 5, 9-10 (1980).  <u>Pro se</u> complaints are therefore held to a less stringent standard than those drafted by attorneys. <u>Id.</u>  Liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a cognizable claim.  <u>See</u> <u>Weller v. Dep't of Soc. Servs.</u>, 901 F.2d 387, 390-91 (4th Cir. 1990).

**C.     Summary Judgment**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor.  Id. at 255.

## III.  DISCUSSION

Incumaa objects to the R&R on four grounds:  (1) the magistrate judge erred in failing to discuss the RLUIPA claim under the compelling interest/least restrictive means analysis; (2) the magistrate judge erred in applying case law decided under rational basis scrutiny to the RLUIPA claim; (3) the magistrate judge erred in finding that the government had met its burden of showing that SCDC's policy was the least restrictive means of serving its compelling interest; and (4) the magistrate judge erred by analyzing the due process claim under the Eighth Amendment's deliberate indifference standard instead of the Fourteenth Amendment's procedural due process standard.

The court will consider these objections in turn.

**A.     RLUIPA Claim**

Incumaa objects to the magistrate judge's analysis of his RLUIPA claim on three grounds, all of which are related.

6

RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA demands "a 'more searching standard' of review of free exercise burdens than the standard used in parallel constitutional claims:  strict scrutiny instead of reasonableness."  Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006) (citation omitted).  However, the Supreme Court has not read RLUIPA to "elevate accommodation of religious observances over an institution's need to maintain order and safety."  Cutter v. Wilkinson, 544 U.S. 709, 722 (2005).  The court assumes for the purposes of summary judgment that the Five Percenters are a religion, thus avoiding the "'difficult and delicate task' of examining the nature and sincerity" of Incumaa's beliefs.  Five Percenters, 174 F.3d at 469 (quoting Thomas v. Review Bd., 450 U.S. 707, 714 (1981)).

### 1.    Application of Strict Scrutiny

Incumaa's first objection to the R&R is that the magistrate judge failed to discuss RLUIPA claim under strict scrutiny's compelling interest/least restrictive means analysis.  Pl.'s Objections 1.

A review of the R&R reveals that the magistrate judge analyzed Incumaa's claim under RLUIPA's compelling interest standard.  The magistrate judge first determined that there was a genuine issue of fact as to whether defendant's policies placed a substantial burden on Incumaa's exercise of his religious beliefs.  R&R 21.  Next, the magistrate

7

judge determined that the policies at issue furthered a compelling interest.  R&R 22-23.

Finally, the magistrate judge determined that the policies at issue were the least restrictive

means of furthering that compelling interest.  R&R 23-24.

Because the magistrate judge applied RLUIPA's strict scrutiny standard to his

claim, Incumaa's first objection fails.

### 2.     Application of Case Law Decided Before RLUIPA

Incumaa next objects to the magistrate judge's application of a Fourth Circuit case

decided under a rational basis standard.  Pl.'s Objections 3.

In 1999, the Fourth Circuit held that SCDC's decision to designate the Five

Percenters as an STG did not violate the Free Exercise Clause of the First Amendment.

Five Percenters, 174 F.3d at 469.  Because the case predated RLUIPA, the court applied

rational basis scrutiny to SCDC's policy as directed by the Supreme Court in Turner v.

Safley, 482 U.S. 78 (1987) (holding that a prison regulation that impinges on inmates'

constitutional rights is "valid if it is reasonably related to legitimate penological

interests").  In determining whether SCDC had a legitimate interest in the STG policy,

the Fourth Circuit noted that the purpose of the policy was to "promote the secure, safe,

and orderly operations of all SCDC institutions, . . . to facilitate the early detection of

[STG] activities and members and to ensure, to the extent possible, efficient intervention

into possible volatile situations."  Five Percenters, 174 F.3d at 469 (internal quotation

marks and citation omitted).  The court concluded that "[t]hese are not simply legitimate

penological interests – they are compelling."  Id. (emphasis added).

Incumaa argues that in Five Percenters, the court held SCDC's policy compelling

under the "rationally related/legitimate interest test," not under the "compelling

interest/least restrictive means analysis of RLUIPA."  Pl.'s Objections 4.  His argument confuses the two standards.  There is no compelling interest standard under rational basis scrutiny.  The Fourth Circuit was explicitly indicating that the purposes behind the STG policy were so important that they were not only legitimate under rational basis scrutiny, but that they would also survive strict scrutiny as compelling interests.  Although the RLUIPA may have technically abrogated Five Percenters, because the Fourth Circuit discussed the case under a compelling interest standard, it remains extremely persuasive authority that this court will not disregard.  The state's interest in promoting the secure, safe, and orderly operation of SCDC institutions, facilitating the early detection of STG activities, and ensuring efficient intervention into possible volatile situations is just as compelling today as it was in 1999, when Five Percenters was decided.[2]

Because the magistrate judge did not err in applying the compelling interest analysis of Five Percenters to the present case, Incumaa's second objection fails.

### 3.     Least Restrictive Means

Incumaa's third objection is that the magistrate judge erred in finding that the government had met its burden of showing that SCDC's policy was the least restrictive means of serving its compelling interest.  Pl.'s Objections 5.

Once the government establishes that a policy is in furtherance of a compelling governmental interest, it must establish that the policy is the least restrictive means of furthering that compelling interest.  See 42 U.S.C. § 2000cc-1(a)(2).  While RLUIPA

---

[2] Incumaa argues that because the number of incidents involving Five Percenters has decreased since Five Percenters was decided, there is a question of whether a compelling interest still exists today.  Pl.'s Objections 4.  That decrease, however, does not change SCDC's interest in safe, secure institutions.  If anything, it is relevant to whether the STG policy is the least restrictive means of achieving that interest.

adopts a strict scrutiny standard, <u>Lovelace</u>, 472 F.3d at 198 n.8, it was not intended to "elevate accommodation of religious observances over an institution's need to maintain order and safety." <u>Cutter</u>, 544 U.S. at 722; <u>Lovelace</u>, 472 F.3d at 190. The Supreme Court has noted that its "decisions indicate that an accommodation must be measured so that it does not override other significant interests" and thereby run afoul of the Establishment Clause. <u>Cutter</u>, 544 U.S. at 722. Therefore, in analyzing whether a particular regulation is the least restrictive means of furthering the government's compelling security interest, the reviewing court must avoid "substituting its judgment in place of the experience and expertise of prison officials." <u>Hoevenaar v. Lazaroff</u>, 422 F.3d 366, 370 (6th Cir. 2006) ("In conducting an analysis of whether the regulation in issue was the least restrictive means of furthering the government's compelling security interest, the district court did just what the Supreme Court and Congress have warned against: substituting its judgment in place of the experience and expertise of prison officials.").

The Fourth Circuit requires that the "government, consistent with the RLUIPA statutory scheme, acknowledge and give some consideration to less restrictive alternatives." <u>Couch v. Jabe</u>, 679 F.3d 197, 203 (4th Cir. 2012); <u>see also</u> <u>Smith v. Ozmint</u>, 578 F.3d 246 (4th Cir. 2009) (vacating grant of summary judgment in favor of prison officials because the affidavit they relied on was insufficient to show that the policy at issue was the least restrictive means of furthering the identified compelling interest); <u>Washington v. Klem</u>, 497 F.3d 272, 284 (3rd Cir. 2007) ("[T]he phrase 'least restrictive means' is, by definition, a relative term. It necessarily implies a comparison with other means."). Once the government provides an explanation for the least

restrictive means prong, courts will defer to the wisdom and judgment of prison officials on matters of security.  Couch, 679 F.3d at 204; see Lovelace, 472 F.3d at 190 (holding that once the government provides an explanation for a policy's restrictions, the court will afford such explanation "due deference").

In a supplemental affidavit provided at the court's request, SCDC's Deputy Director of Operations Robert E. Ward laid out two less restrictive alternatives that the department has considered.  The first would be to remove the Five Percenters from the list of STGs.  Wade asserts that "[t]here have continued to be assaults, disturbances, and other criminal activities committed by Five Percenters since [they were designated a STG], and . . . there has been no valid basis for removing the Five Percenters from the list of designated STGs."  Wade Aff. ¶ 5.  Wade goes on to opine that although the number of assaults committed by Five Percenters has declined since 2003, "the potential or even likelihood of assaultive behaviors by Five Percenters remains a reality and an issue that must be addressed by security operations."  Id. ¶ 6.  If Five Percenters currently in security detention were released into the general prison population, Ward believes that "the number of serious disciplinaries including assaults, riots, and similar behaviors would dramatically increase."  Id.

A second less restrictive alternative that the government has considered, according to Ward, is placing Five Percenters in a "close custody unit."  Wade Aff. ¶ 8. While acknowledging that using a close custody unit to house Five Percenters rather than security detention cells "may provide the same level of safety and security to other inmates," Ward opined that "it would create numerous other issues and concerns."  Id. Specifically, it would allow "gangs to be identified," "create the risk of targeting," and

"increase the likelihood of inter-gang violence," as well as "allow gang members easier access to one another and allow more opportunity for communication and planning." Id. Ward notes that "most importantly, the use of a close custody unit would create a heightened level of danger for the correctional officers and other staff who would work in that unit." Id. Based on these considerations, SCDC rejected such an approach as "unworkable and dangerous." Id.

In addition to the less restrictive alternatives that SCDC has considered, Ward notes that SCDC has made changes to the STG policy and classification process since it was instituted. According to Ward,

> [i]nitially, after the Five Percenters were designated as an STG, validated members were all re-classified to Security Detention, regardless of their individual circumstances and disciplinary history. Since that time, SCDC developed two separate classifications, Validated-STG-GP and Validated-STG-SD, which taken into account the inmates' individual circumstances and are assessed on an individual basis. Therefore, an inmate who is validated as a member of an STG who has not committed serious disciplinary infractions may be classified as Validated-STG-GP and is allowed to remain in the general population.

Ward Aff. ¶ 9. SCDC has actually implemented procedures to make the application of the STG policy less restrictive, particularly for those inmates whose prior conduct and individual circumstances did not necessarily warrant security detention.[3]

SCDC has not just considered less restrictive means – it has actually implemented a less restrictive alternative to their original policy. The court therefore gives SCDC its

---

[3] In his objections to the R&R, Incumaa suggests that SCDC not designate the Five Percenters an STG, but rather "only segregate its members after they have committed violent, disruptive, and/or criminal acts within the SCDC." Pl.'s Objections 7. As discussed above, and recognized by the magistrate judge, the alternative proposed by Incumaa is "exactly the process that has been applied to [him]." R&R 24.

due deference and finds, as the Fourth Circuit did in 1999, that "there are no ready alternatives to the SCDC's course of action."  Five Percenters, 174 F.3d at 470.

Because the STG policy is the least restrictive means of furthering the government's compelling interests, Incumaa's third objection fails.

### B.    Due Process Claim

Lastly, Incumaa objects to the magistrate judge's treatment of his Fourteenth Amendment claim.  Pl.'s Objections 9.  He argues that the magistrate judge treated his claim as an Eighth Amendment violation instead of a procedural due process claim.  Id. While the magistrate court did discuss the Eighth Amendment at length, R&R 16-18, he also briefly discussed Incumaa's due process claim, R&R 18-19.  However, because the magistrate judge did not address the atypical and significant hardship standard of Sandin v. Conner, 515 U.S. 472 (1995), this court will review Incumaa's due process claim in light of Sandin and is progeny.

The Fourteenth Amendment's Due Process Clause guards against unlawful deprivations of life, liberty, or property.  U.S. Const. amend. XIV, § 1.  There is a two-step process for analyzing alleged procedural due process violations.  See Burnette v. Fahey, 687 F.3d 171, 181 (4th Cir. 2012) (laying out two-step process for procedural due process violations).  The court must first consider whether, and to what extent, the inmate has a protectable interest under the Due Process Clause.  Id.  If the court determines that the inmate has asserted a protectible interest, the court must then determine whether the government failed to afford him the minimum procedural protections required by the Fourteenth Amendment in depriving him of this interest.  Id.

13

In <u>Sandin</u>, the Supreme Court recognized that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." 515 U.S. at 483-84.  However, the Supreme Court noted that "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Id.</u> at 484.  After <u>Sandin</u>, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'"  <u>Wilkinson v. Austin</u>, 545 U.S. 209, 222-23 (2005) (quoting <u>Sandin</u>, 515 U.S. at 483).  The Supreme Court in <u>Wilkinson</u> held that, in order to measure whether an inmate's custodial situation imposes "an atypical and significant hardship within the correctional context," it must be measured against a "baseline."  545 U.S. at 223-24. While <u>Wilkinson</u> did not establish a particular "baseline," the Fourth Circuit uses the conditions "imposed on the general population" as the baseline for its analysis.  <u>Beverati v. Smith</u>, 120 F.3d 500, 504 (4th Cir. 1997).  "There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration."  <u>Ramirez v. Galaza</u>, 334 F.3d 850, 861 (9th Cir. 2003) (quotation marks and citation omitted); <u>see also</u> <u>Farmer v. Kavanagh</u>, 494 F. Supp. 2d 345, 356 (D. Md. 2007) (noting that <u>Wilkinson</u> "directs lower courts to consider the totality of circumstances in a given facility").

Incumaa argues that the following conditions together constitute an atypical and significant hardship in relation to the ordinary incidents of prison life: he is allowed only an hour per day of recreation either two or three days per week; he is allowed a ten-minute shower only on Monday, Wednesday, and Friday; he is confined to a cell at all times except the time permitted for recreation or to shower; he is strip-searched, including a search of his genitalia and rectum, every time he leaves his cell; he is served smaller portions of food compared to the general prison population; his legal and personal property is limited to what can fit into a 15-inch by 12-inch by 10-inch box; he is denied canteen privileges; he is denied the opportunity for a work assignment; he is denied educational and vocational opportunities; and he is denied the opportunity to receive mental health treatment. Pl.'s Br. in Supp. of Compl. 5-6. Incumaa claims that "the most atypical and significant hardship being imposed on [him] is the length of time he has been confined to administrative segregation." Pl.'s Objections 11.

Although the atypical and significant hardship inquiry is "necessarily context-dependent and demands fact-by-fact consideration," Prieto v. Clarke, 2013 WL 6019215, at *5 (E.D. Va. Nov. 12, 2013), two cases are particularly insightful for their analysis of when administrative segregation gives rise to a liberty interest. The first is Wilkinson v. Austin, 545 U.S. 209 (2005). In Wilkinson, the Supreme Court held that inmates had a liberty interest in avoiding assignment to Ohio's supermax prison. Id. at 224. In reaching this conclusion, the Court distinguished the supermax facilities from normal segregation units on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact." Id. at 214. The facility had solid metal doors with metal strips along their sides

15

and bottoms which prevented conversation or communication with other inmates.  Id.
Second, they were assigned to the supermax facility for "an indefinite period of time,
limited only by [the] inmate's sentence."  Id. at 214-15.  Third, once assigned to
supermax, "[i]nmates otherwise eligible for parole [lost] their eligibility while
incarcerated" at the facility.  Id. at 215.  After noting other onerous conditions of
confinement, including cells that were lighted 24 hours per day and only one hour per day
of exercise, the court stated held that "[w]hile any of these conditions standing alone
might not be sufficient to create a liberty interest, taken together they impose an atypical
and significant hardship within the correctional context."  Id. at 224.

The second case that the court finds instructive is Beverati v. Smith, 120 F.3d 500
(4th Cir. 1997), which the Fourth Circuit decided before Wilkinson.[4]  In Beverati, the
Fourth Circuit considered whether prisoners had a liberty interest when they were
confined in administrative segregation for six months in "unbearably hot" cells that were
infested with vermin, smeared with human feces and urine, and flooded with toilet water.
120 F.3d at 504.  The inmates were only allowed to leave their cells three or four times a
week, were not allowed outside recreation, were denied educational or religious services,

_____

[4] Even though Beverati predates Wilkinson, at the very least it suggests that the
bar for proving an atypical and significant hardship is quite high in the Fourth Circuit.
Beverati, 120 F.3d at 504.  Additionally, even since Wilkinson the Fourth Circuit has
cited Beverati in rejecting the notion that inmates enjoy a protected liberty interest in
avoiding confinement in administrative segregation, United States v. Daniels, 222 F.
App'x 341, 342 n.* (4th Cir. 2007) (unpublished) (per curiam) ("Extended stays on
administrative segregation . . . do not ordinarily implicate a protected liberty interest."
(citing Beverati, 120 F.3d at 502)), and courts in this district have relied on Beverati in
procedural due process cases involving administrative segregation.  See, e.g., Morris v.
York, No. 0:13-cv-01031, 2013 WL 2635610, *2 (D.S.C. June 12, 2013) (citing Beverati
and holding that "administrative segregation, without more, does 'not present the type of
atypical, significant deprivation in which a State might conceivably create a liberty
interest'" (citation omitted)).

and were given "considerably smaller portions" of food.  Id.  The Court held that

"although the conditions were more burdensome than those imposed on the general

prison population, they were not so atypical that exposure to them for six months

imposed a significant hardship in relation to the ordinary incidents of prison life."  Id.

Some of the conditions in the SMU that Incumaa points to as presenting an

atypical and substantial hardship are similar to those discussed in Beverati, including

Incumaa being allowed to leave his cell only a handful of times each week, being denied

educational and vocational opportunities, and being given "considerably smaller

portions" of food.  However, besides the length of his confinement to administrative

segregation, the court finds that Incumaa has not alleged living conditions nearly as bad

as those present in Beverati.  In fact, conditions such as those alleged would "likely . . .

apply to most solitary confinement facilities."  Wilkinson, 545 U.S. at 224.

While recognizing that the deprivations detailed in that case exist in most solitary

confinement facilities, the Supreme Court in Wilkinson looked at the presence of two

additional factors to find "an atypical and significant hardship" on inmates such that they

had a liberty interest in avoiding it.  Id.  Those factors were the potentially indefinite

length of detention and the fact that placement in administrative segregation disqualified

otherwise eligible inmates for parole consideration.  Id.  The first of these factors,

indefinite confinement, while not completely absent in Incumaa's case, is "substantially

ameliorated by [SCDC's] renunciation program."  Tate v. Starks, 2013 WL 5914398, at

*4 (N.D. Miss. Nov. 4, 2013).  As discussed above, SCDC has a process by which an

inmate can renounce his membership in an STG and return to the general prison

population.  See Pearson Aff. ¶¶ 14-19.  This renunciation procedure gives Incumaa

17

substantial influence over the length of his stay in administrative segregation, and he

could have potentially returned to the general prison population years ago had he chosen

to renounce his affiliation with the Five Percenters.  Additionally, Incumaa has his

classification status reviewed every 30 days, Pearson Aff. ¶ 14; Stobee Aff. ¶ 3, whereas

the inmates in <u>Wilkinson</u>, following an initial 30-day review, had their confinement

reviewed just annually.  545 U.S. at 224.  Therefore, Incumaa's confinement, while

indefinite as long as he identifies as a Five Percenter, is subject to substantially more

favorable conditions than the inmates in <u>Wilkinson</u>.[5]  The second factor that the Supreme

Court found significant in <u>Wilkinson</u> – automatic disqualification from consideration of

parole – is absent from Incumaa's case.  There has been no evidence advanced that

placement in administrative segregation as a result of classification as a member of a

STG impacts, influences, or eliminates parole consideration for SCDC inmates.

Regardless, Incumaa's administrative segregation could not impact his eligibility for

parole, because he is serving a life sentence for murder, <u>Incumaa v. Ozmint</u>, 507 F.3d

---

[5] The court notes that several other circuits have held that confinement in administrative segregation for a definite, limited time period short of indefinite duration implicates a liberty interest.  <u>See, e.g.</u>, <u>Marion v. Columbia Corr. Inst.</u>, 559 F.3d 693, 699 (7th Cir. 2009) ("[O]ther courts of appeals have held that periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any [specific] reference to conditions."); <u>Iqbal v. Hasty</u>, 490 F.3d 143, 161 (2d Cir. 2007), <u>rev'd on other grounds</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) (explaining that a segregated confinement of 305 days or more necessarily triggers due process protections, and segregation lasting 101 to 305 days may trigger due process protections, depending on the conditions of segregation); <u>Trujillo v. Williams</u>, 465 F.3d 1210, 1225 (10th Cir. 2006) (reversing dismissal of claim involving 750 days' segregation, stating that when a "prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant"); <u>Williams v. Fountain</u>, 77 F.3d 372, 374 (11th Cir. 1996) (holding that one year of solitary confinement was sufficient to state a claim); <u>but see</u> <u>Smith v. Mensinger</u>, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months' segregation, alone, does not implicate a liberty interest).  However, neither the Supreme Court nor the Fourth Circuit has found a liberty interest based solely on the length of confinement in administrative segregation.

281, 283 (4th Cir. 2007), which he admits precludes parole.  Pl.'s Decl. 7.  The court also notes that Incumaa has not alleged the extreme isolation present in Wilkinson, which the Supreme Court also considered significant in finding a protected liberty interest. Wilkinson, 545 U.S. at 223.

Based on the totality of the circumstances surrounding Incumaa's confinement in administrative segregation, the court cannot find that the conditions of his confinement rise to the level of an atypical and substantial hardship.  Most of the conditions alleged are nothing more than "the usual aspects of a solitary confinement facility," Menei v. Rubenstein, 2012 WL 4845659, at *5 (S.D. W. Va. October 11, 2012), and do not reach anything near the conditions alleged and found insufficient by the Fourth Circuit in Beverati.  Moreover, the factors that the Supreme Court relied on in Wilkinson apply with much less force here – Incumaa has not alleged that confinement in administrative segregation will disqualify him from parole consideration and SCDC's renunciation procedure puts the duration of his confinement into his own hands to a significant degree. Because the court has determined that Incumaa does not have a protectible liberty interest in avoiding administrative segregation, it is not necessary to determine whether the government afforded him the minimum procedural protections required by the Fourteenth Amendment.

Although the court does not adopt the reasoning of the R&R, it adopts the result reached by the magistrate judge and therefore Incumaa's fourth objection fails.

## IV.   CONCLUSION

Based on the foregoing, the court **ADOPTS** the magistrate judge's R&R and **GRANTS** defendant's motion for summary judgment.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 11, 2014**
**Charleston, South Carolina**